# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

STATE OF FLORIDA,

       Plaintiff,

vs.

BP EXPLORATION & PRODUCTION
INC., BP p.l.c., BP AMERICA
PRODUCTION COMPANY, and
HALLIBURTON ENERGY
SERVICES, INC.,

       Defendants.

CASE NO.:

_____/

## COMPLAINT

Plaintiff, STATE OF FLORIDA ("Florida" or "State"), sues Defendants, BP Exploration and Production Inc., BP p.l.c., BP America Production Company, and Halliburton Energy Services, Inc., for loss of tax revenue and income and other economic damages or losses as a result of the oil spill following the sinking of the oil rig *Deepwater Horizon* in the Gulf of Mexico on or about April 20, 2010, and alleges as follows:[1]

---

[1] Plaintiff is aware that certain Transocean entities commenced an action under the Limitation of Shipowners Liability Act. Subject to a determination as to the Transocean entities' ability to limit liability, Plaintiff reserves the right to amend this Complaint to add additional claims and parties.

**Introduction**

1.      In April 2010, the actions of BP Exploration and Production, Inc., BP, p.l.c., and Halliburton Energy Services, Inc. resulted in the worst oil spill in American history, with the unfettered release of millions of gallons of hydrocarbons directly into the Gulf of Mexico.  As a result of the uncontrolled well event, blowout, multiple explosions, and fires, millions of barrels of oil were discharged into and upon waters of the Gulf of Mexico and adjoining shorelines of the United States, including the pristine beaches, shorelines, and estuaries of Florida.  The full extent of the impact of the spill is not yet known and may not be known for several years.

2.      This action arises out of the economic losses suffered by Florida due to the release of millions of gallons of hydrocarbons into the Gulf of Mexico from the oil well drilled in Mississippi Canyon Block 252 (hereinafter referred to as the "Macondo Well") following the explosions and fire aboard the MODU *Deepwater Horizon* that resulted in its sinking and the subsequent release of hydrocarbons (the "Spill").  Oil flowed into the Gulf of Mexico unchecked for months.

3.      Florida's tourism-centered economy suffered greatly from the effects of the Spill.  Florida receives over 85,000,000 visitors per year and

generates more than $80 Billion dollars in tourism-dependent revenue. Without this level of tourism, Florida suffers, as do many of the local people and communities who are supported by it.

4.     A major part of the Florida economy's tourism focus is its beautiful beaches.  Florida has 1,200 miles of coastline, which is more than all of the other Gulf Coast states *combined*.  In this context, the extent of Florida's coastline equals greater economic damages both during and after the Spill along with an exponentially higher risk of harm from any re-oiling event or other possible future consequences from the Spill.

5.     As a result, Florida has sustained, and will continue to sustain, significant economic losses.

## Jurisdiction and Venue

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1333, the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2717(b), and 43 U.S.C. § 1349(b)(1).

7.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims because those claims are so related to the federal claims in the action that they form part of the same case or controversy.

8.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) (venue generally) and 33 U.S.C. § 2717(b) (OPA).

## Parties

9.    Florida is and was at all material times engaged in the implementation and management of the governmental infrastructure for its citizens.

10.    BP Exploration & Production Inc. ("BPXP") is and was at all material times a business organized under the laws of Delaware with its principal place of business in Warrenville, Illinois and with its principal purpose being oil and gas exploration and production.  BPXP is registered to engage in business in Florida, maintains continuous and systemic contacts in Florida, and is subject to personal jurisdiction in Florida.  BPXP was designated a Responsible Party as that term is contemplated under the Oil Pollution Act, 33 U.S.C. § 2701(32) and Fla. Stat. §376.031(20).

11.    BP p.l.c. (collectively with BPXP referred to herein as "BP") is and was at all material times a British multinational oil and gas company headquartered in London, United Kingdom.  BP p.l.c. maintains continuous and systemic contacts in Florida and is subject to personal jurisdiction in Florida.  BP p.l.c. publicly acknowledged that it would cover or otherwise

make funds available for damages assessed against BPXP as a result of the Spill, including, but not limited to, damages under OPA.

12.     BP America Production Company ("BP America") is and was at all material times a business organized under the laws of Delaware with its principal place of business in Houston, Texas. BP America contracted with Transocean Ltd. for the drilling of the Macondo Well by the MODU *Deepwater Horizon*. BP America is registered to conduct business in Florida, maintains continuous and systemic contacts in Florida, and is subject to personal jurisdiction in Florida.

13.     Halliburton Energy Services, Inc. ("Halliburton") is and was at all material times a Delaware corporation with its principal places of business in Houston, Texas and Dubai, United Arab Emirates and was authorized to do business in Florida, maintains continuous and systemic contacts in Florida, and may be found in Florida. Halliburton was engaged in cementing operations aboard *Deepwater Horizon* at the Macondo Well. Halliburton is and was at all material times in the business of designing and implementing cement mixes for use in various applications, including, but not limited to, deepwater oil exploration activities.

14.    Sperry Drilling Services ("Sperry," together with Halliburton collectively referred to as "Halliburton") is a division of Halliburton and was responsible for mudlogging personnel and equipment on the MODU *Deepwater Horizon*, including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

15.    At all material times prior to the Spill, the MODU *Deepwater Horizon* was a vessel and an offshore facility, capable of being used to drill offshore wells, flagged under the laws of the Republic of the Marshall Islands.

16.    At all times material hereto, *Deepwater Horizon* had as part of its operating equipment and appurtenances a Blowout Preventer ("BOP") and a Lower Marine Riser Package ("LMRP") (together the "BOP stack"), a marine riser and associated piping, and other equipment, all of which constitute, *inter alia*, "appurtenances" under Admiralty law.

**Factual Allegations**

17.    On or about May 8, 2008, BPXP, as lessee, executed the document known as the "Oil and Gas Lease of Submerged Lands under the

Outer Continental Shelf Lands Act," "Serial number OCS-G 32306" (hereinafter the "Lease"), pertaining to "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

18.     On or about May 14, 2008, the United States, by and through the Minerals Management Service (hereinafter "MMS"), as lessor, executed the Lease, which became effective on June 1, 2008.

19.     As lessee of the Lease, BPXP at all material times was subject to, *inter alia*, the requirements of 30 C.F.R. § 250.400 and the regulations specified therein.

20.     On or about October 2009, drilling began at the Macondo Well.

21.     At all times material herein, the Macondo Well was an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

22.     Beginning in or about February 2010, the MODU *Deepwater Horizon* was utilized for the purpose of continuing the drilling of the Macondo Well.  Drilling of the Macondo Well using the *Deepwater Horizon* continued in February 2010 and through March and a portion of April 2010.

23.     As of April 20, 2010, various sub-sea equipment and components of the Macondo Well had been installed on or below the

seafloor of the Outer Continental Shelf, including, but not limited to, the well casing and the well head.

24.    As of April 20, 2010, *Deepwater Horizon* and various appurtenances of the *Deepwater Horizon,* including, but not limited to, the BOP stack and marine riser*,* were installed on and/or attached to the seafloor of the Outer Continental Shelf, purportedly for purposes of, *inter alia*, operation of the Macondo Well, including well control.

25.    On or about April 20, 2010, the Macondo Well experienced an uncontrolled well event and blowout of hydrocarbons, including oil and natural gas.

26.    The loss of well control was due to the failure of mechanical and cement barriers to seal off the well against the influx of highly pressurized hydrocarbons from the reservoirs surrounding the bottom of the well.  The many indications that hydrocarbons were leaking into the well were misinterpreted and/or overlooked by BP and Halliburton for about 50 minutes prior to the blowout.  Once the hydrocarbons reached the vessel decks, fire and gas prevention and alarm systems on the vessel failed to warn the crew and prevent ignition of a fire.  The vessel's subsea BOP also failed

to seal the well and stop the flow of hydrocarbons fueling the fire, which exacerbated the disaster.

27.     After *Deepwater Horizon* sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for approximately 12 weeks, fouling the environment, damaging and contaminating real and personal property, and doing immense and long-lasting economic damage.

28.     *Deepwater Horizon* utilized a mud gas separator to remove hydrocarbon gas from the mud utilized for drilling purposes.  The mud gas separator is and was at all material times a low-pressure system.  BP and Halliburton knew or should have known the design limits of the mud gas separator would have been exceeded by the expanding and accelerating hydrocarbon flow back to *Deepwater Horizon* and, in fact, were exceeded.

29.     The mud gas separator gas outlet vent was positioned in such a manner as to direct potentially concentrated levels of gaseous fumes onto or below the deck of *Deepwater Horizon* and possibly into confined spaces, allowing for the rig to be enveloped in a flammable mixture of gases.

30.     The first indications of the flow of hydrocarbons from the well were observable in the real-time data recorded on *Deepwater Horizon*.  BP

and Halliburton either did not observe or did not recognize the indications of flow until after hydrocarbons entered the riser.

31. Neither BP's nor Halliburton's protocols fully addressed how to respond to a high-flow emergency situation after the loss of well control.

32. Halliburton was hired to design and implement a cement slurry mix or combination of mixes capable of properly sealing the Macondo Well at a depth of approximately 5,000 feet below the sea surface.

33. The principal purpose of the cement slurry design mix that Halliburton was responsible for developing and implementing was to seal the Macondo Well to such an extent as to prevent the escape of hydrocarbons from the wellbore that could cause personal injury, death, property, and/or environmental damage.

34. Halliburton designed a number of cement slurry mixes, including a foam cement slurry, to be used to seal the Macondo Well.

35. Halliburton conducted numerous tests relating to the foam cement slurry design mix intended to be used to seal the Macondo Well. The test results of the foam design slurry mix revealed, *inter alia*, an insufficient, non-representative nitrogen volume in the design slurry, indicating that the foam cement slurry was likely unstable and would result

in nitrogen breakout.  Additionally, the test results revealed that the low yield point of the foam cement slurry mix could or would lead to difficulty in foam stability, that the use of a defoamer could or would lead to difficulty in foam stability, and that the lack of an additive controlling fluid loss could or would allow fluid to be lost at a rate greater than that recommended and accepted in industry practice.

36.    Despite the test results of the design slurry, Halliburton made no recommendations for changing, altering or otherwise modifying the foam cement slurry mix design.

37.    Halliburton recommended and, in fact, utilized the foam cement slurry mix design that revealed the numerous aforementioned flaws during the testing protocol without changing, altering or otherwise modifying the mix design prior to its implementation.

38.    As a result of the inadequate, insufficient, and demonstrably faulty mix design, the nitrified foam slurry suffered nitrogen breakout, nitrogen migration, and incorrect cement density, all of which contributed to the failure to properly achieve zonal isolation of hydrocarbons.

39.    Although the BOP was designed to automatically actuate in the event of a sudden loss of pressure, the automatic mode function failed to

operate the BOP's blind shear ram upon the loss of hydrostatic control over the flow of hydrocarbons in the Macondo well.  The response teams were unable to manually activate *Deepwater Horizon*'s BOP to prevent the continuous flow of hydrocarbons from the Macondo well.

40.     The BOP utilized a series of 9-volt battery packs to operate the automatic mode function actuator in each pod and solenoids to relay signals to the various mechanical components of the BOP.

41.     At all material times, BP knew or should have known that the manufacturer recommended replacement of the batteries in the battery packs at least once per year or after 33 actuations, whichever occurred first.

42.     The maintenance records reveal that BP did not replace the batteries in the battery packs per the manufacturer's recommendations.

43.     The batteries had an insufficient charge to activate the automatic mode function and actuate the blind shear ram.  The failure to actuate the blind shear ram prevented the wellbore from being sealed at the location of the BOP.

44.     The BOP utilized solenoid valves to relay actuation of the various sealing methods in the BOP.

45.    Solenoid valve 103, which was required to operate the high-pressure blind shear ram close function, had a non-original equipment manufacturer electrical connector installed and was found to be defective. Solenoid valve 3A, which was required to increase the upper annular preventer regulator pressure, was also found to be defective.

46.    BP knew or should have known that failing to properly maintain these essential elements of the BOP would render the BOP inoperative and/or unreliable.

47.    The failure of the solenoid valves identified herein prevented the closure of the blind shear ram and the activation of the upper annular preventer, thereby allowing hydrocarbons to continue to escape from the wellbore.

48.    As a result of the lack of hydrostatic control over the hydrocarbons and the failure of the BOP to activate, there were explosions and fires aboard *Deepwater Horizon* that led to its sinking.  As *Deepwater Horizon* sank to the seafloor, the attached riser bent and broke, allowing hydrocarbons to escape from the broken end of the riser and two additional places along its length.

49.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BP and Halliburton failed, *inter alia*, to take necessary precautions to keep the Macondo Well under control.

50.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BP and Halliburton failed, *inter alia*, to use the best available and safest drilling technology to monitor and evaluate the Macondo Well's conditions and to minimize the potential for the Macondo Well to flow or kick.

51.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BP and Halliburton failed, *inter alia*, to fulfill its respective responsibilities to maintain well control of the Macondo Well.

52.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BP and Halliburton failed, *inter alia*, at times relevant herein to maintain continuous surveillance on the rig floor.

53.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BP and Halliburton failed, *inter alia*, to maintain equipment and materials, including, but not limited to, the BOP stack, that were available and necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment.

54. BP and Halliburton caused and/or contributed to the Spill by failing to assure well control of the Macondo Well through, *inter alia*, actions, corporate actions, and/or corporate practices of disregarding federal regulations, as evidenced by various safety and other audits of *Deepwater Horizon*, reflecting the known failure, prior to the Spill, to properly design, install, maintain, repair, and operate equipment intended to prevent personal injury, loss of life, harm to the environment, and disasters like the Spill.

55. BP and Halliburton caused and/or contributed to the Spill by failing to assure well control of the Macondo Well through, *inter alia*:

    a. Failing to assure that well control was maintained by proper and adequate cementing of the Macondo Well;

    b. Failing to assure that well control was maintained by mechanical barriers, including, but not limited to, the BOP stack;

    c. Failing to assure that well control was maintained by proper and adequate inspection and maintenance of the BOP stack;

    d. Failing to assure that well control was maintained by proper and adequate pressure testing;

e.    Failing to assure that well control was maintained by the use of appropriate fluids to maintain hydrostatic pressure on the wellbore;

f.    Failing to assure that well control was maintained by proper and adequate well monitoring;

g.    Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

h.    Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons; and

i.    Failing to assure that, once well control initially was lost, well control was regained by proper and adequate BOP stack emergency operations.

56.    As a result of the April 20, 2010, uncontrolled well event and blowout, multiple explosions and fires occurred aboard *Deepwater Horizon*.

57.    As a result of the discharge of oil and methane gas and the resulting multiple explosions and fires that occurred aboard *Deepwater Horizon*, equipment was damaged and/or destroyed, which equipment could

have prevented and/or limited further damage and injury, including the prevention and/or limitation of discharge of oil into and upon waters of the Gulf of Mexico and adjoining shorelines of the United States, including Florida.

58.     As a result of the uncontrolled well event, blowout, multiple explosions, and fires, millions of barrels of oil were discharged from the Macondo Well, associated equipment, the BOP stack, the marine riser, and *Deepwater Horizon* into and upon waters of the Gulf of Mexico and adjoining shorelines of the United States, including Florida.

59.     The Spill resulted from one or more of the following: acts, joint acts, omissions, fault, negligence, gross negligence, willful misconduct, and/or breach of federal safety and/or operating and/or construction regulations by BP, Halliburton and/or their respective agents, servants, employees, crew, contractors and/or subcontractors with whom said Defendants had contractual relationships.

60.     To date, the Macondo Well has been capped to prevent the continued flow of hydrocarbons into the Gulf of Mexico.  However, the hydrocarbons that escaped prior to the well's capping made landfall along

the Gulf coastline in Florida, and much of it remains in the Gulf of Mexico and on the seafloor.

61.    The fire and explosion on *Deepwater Horizon*, its sinking, and the resulting release of hydrocarbons were caused by the combined and concurring improper acts and omissions of BP and Halliburton, which renders them jointly and severally liable for all of the economic damages suffered by Florida.

62.    BP and Halliburton knew or should have known of the dangers and risks associated with deepwater drilling and failed to take appropriate measures to prevent foreseeable damage to Florida.

63.    The escaped hydrocarbons have caused, and will continue in the future to cause, a dangerous and harmful contamination of the Gulf of Mexico.

64.    The pristine nature of the Gulf of Mexico and its surrounding marine and estuarine environments attracts numerous patrons, tourists, and visitors to Florida; however, the release of hydrocarbons has tainted the Gulf of Mexico, thereby causing many of the would-be patrons, tourists, and visitors to travel to and engage in commercial activities in other, less Gulf-oriented locales, if at all.  Indeed, Florida relies on the pristine nature of the

Gulf of Mexico as the source for much of the attraction of patrons, tourists, and visitors.

65.     Due to the released hydrocarbons and their contamination of the Gulf of Mexico, Florida suffered a dramatic decrease in the number of people visiting and patronizing the State.  Accordingly, Florida has lost substantial tax revenues, including, but not limited to, lost Business Tax Receipts measured by gross sales of Merchants;  lost Public Service Tax receipts; lost Communication Services Tax; and lost net revenue.

66.     The Spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses, thereby causing a loss of revenue to Florida.

67.     The Spill dealt a devastating blow to tourism in the region and the individuals and businesses that ordinarily thrive on tourism and tourism-related business.

68.     The foregoing losses in the private sector have caused severe damage to Florida in the form of lost income and tax revenues.

69.    The oil impacted, injured, and damaged the waters, shores, and estuaries of Florida leading to the economic losses that are being sought in this action.[2]

70.    As the contamination of the Gulf of Mexico persists, Florida will suffer further lost revenues in the future.

71.    There are many other potential effects from the released hydrocarbons that have not yet become known and Florida reserves the right to amend this Complaint once additional information becomes available.

**COUNT I**
**(Strict Liability Under OPA, 33 U.S.C. §§ 2702(b)(2)(D) Against BPXP and BP p.l.c. for Lost Revenues)**

72.    Florida realleges the allegations of paragraphs 1 through 27 and 63 through 71 of this Complaint and further alleges:

73.    BPXP was designated as a "Responsible Party" as that term is defined in OPA, 33 U.S.C. § 2701(32).

74.    OPA is a strict liability statute with the "Responsible Party" liable for the damages specified therein.  *See* 33 U.S.C. § 2702(a).

---

[2] The claim for the damage to Florida's natural resources is vested in the State trustee by OPA section 2702(b)(2)(A).  The claims in this lawsuit are limited to the economic losses suffered due to the injury to and destruction of natural resources.

20

75.    As a result of the Spill, Florida sustained and will sustain "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).

76.    Florida has satisfied the claims presentment requirement under OPA, 33 U.S.C. § 2713.

77.    Florida derives much of its revenue from economic activity related to its waters, estuarine environments, pristine beaches, and marine life.

78.    The Spill permitted oil to impact Florida's territorial waters and wash upon Florida's beaches, thereby causing would-be visitors to avoid visiting the State.

79.    As a result of the Spill, Florida suffered the loss of taxes and fees, including but not limited to sales and use taxes; corporate taxes; documentary stamp taxes; cigarette surcharges; cigarette excise taxes; beer, wine, and liquor taxes; fuel taxes; rental car surcharges; and utility taxes and receipts, and Florida will continue to suffer such losses in the future.  Such damages are recoverable under OPA, 33 U.S.C. § 2702(b)(2)(D).

## COUNT II
### (Negligence Under Florida Common Law Against All Defendants)

80.    Florida realleges the allegations of paragraphs 1 through 71 of this Complaint and further alleges:

81.     The explosions, fire, sinking of *Deepwater Horizon*, release of hydrocarbons, and resulting contamination were caused or contributed to by the joint negligence of Defendants in the following respects, among others that will be revealed during further investigation and discovery:

a.      Failing to properly maintain, equip and/or operate *Deepwater Horizon*;

b.      Operating *Deepwater Horizon* in such a manner as to cause explosions and fires onboard, causing it to sink and result in the release of hydrocarbons;

c.      Failing to properly inspect and equip *Deepwater Horizon* with the appropriate equipment and personnel;

d.      Acting in a careless, reckless, and negligent manner;

e.      Failing to promulgate, implement, and enforce appropriate rules and regulations to ensure the safe operations of *Deepwater Horizon*, which could and would have prevented the disaster;

f.      Failing to take appropriate action to avoid, mitigate or remedy the disaster;

g.    Carelessly, recklessly, and negligently implementing policies and procedures for safe conduct during offshore operations in the Gulf of Mexico;

h.    Failing to ensure that *Deepwater Horizon* and its equipment were in proper working order and/or were free from defects;

i.    Failing to timely warn;

j.    Failing to timely control the release of hydrocarbons from the Macondo Well;

k.    Failing to provide appropriate and effective disaster prevention equipment; and

l.    Acting with clear disregard for the life, personal property, real property and/or environment in or around the Gulf of Mexico and its coastal, marine, and estuarine environments and the livelihoods of those who relied on the same.

82.    The economic injuries to Florida were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the damages associated with the release of hydrocarbons.

83.     Furthermore, the disaster would not have occurred had the Defendants exercised a high degree of care.  Florida, therefore, pleads the doctrine of *res ipsa loquitur*.

84.     The negligence caused the release of hydrocarbons and contamination of the Gulf of Mexico, directly and proximately causing Florida to suffer economic damages exceeding the jurisdictional requirements of this Court as can nearly be determined at this time, which are continuing to accrue.

85.     Florida is entitled to a judgment against Defendants jointly and severally for the economic damages suffered as a result of Defendants' careless, reckless, and negligent acts and/or omissions in an amount to be determined by the trier of fact.

### COUNT III
### (Negligence *Per Se* Against All Defendants under Florida Law)

86.     Florida realleges the allegations of paragraphs 1 through 71 of this Complaint and further alleges:

87.     Defendants' conduct with regard to the manufacture, maintenance, operation and/or utilization of drilling operations and oil rigs such as *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

88.     These laws and permits create statutory standards that are intended to protect and benefit Florida and others.

89.     Defendants' violations of these statutory standards constitute negligence *per se* under Florida law.

90.     Defendants' violations of these statutory standards proximately caused Florida economic damages, warranting an award of compensatory damages against Defendants jointly and severally.

## COUNT IV
### (Gross Negligence Under the General Maritime Law Against All Defendants)

91.     Florida realleges the allegations of paragraphs 1 through 71 of this Complaint and further alleges:

92.     Defendants owed a heightened duty to Florida to exercise reasonable care in the manufacture, installation, maintenance, and operation of *Deepwater Horizon* and its appurtenances.

93.     Defendants had a heightened duty of care to Florida because of the inherent risk and great danger associated with deepwater drilling and the cementing work such as that *Deepwater Horizon* was performing at the time of the explosions and fires.

94.     Defendants breached their legal duty to Florida and failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business of Florida in the negligent manufacture, installation, maintenance and/or operation of *Deepwater Horizon* and its appurtenances.

95.     Defendants knew or should have known that their wanton or reckless conduct would result in a foreseeable blowout and release of hydrocarbons, causing personal injuries, deaths, property and/or contamination of the Gulf of Mexico.  Furthermore, it is and was at all material times foreseeable for the blowout and release of hydrocarbons to cause damage to the economic and business interests of Florida given its proximity to the area affected by the Spill.

96.     As a direct and proximate result of Defendants' wanton or reckless conduct, Florida has suffered legal injury and damages for which Defendants are liable jointly and severally, including but not limited to, loss of income, loss of profits, and other economic losses.

## COUNT V
## (Gross Negligence Under Florida Law Against All Defendants)

97.     Florida realleges the allegations of paragraphs 1 through 71 of this Complaint and further alleges:

98.     Defendants owed a heightened duty of care to Florida because of the inherent risk and great danger associated with deepwater drilling and the cementing work such as that *Deepwater Horizon* was performing in the vicinity of Florida's coast at the time of the explosions and fires.

99.     Defendants breached their legal duty to Florida and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard for the business of Florida in the negligent manufacture, installation, maintenance and/or operation of *Deepwater Horizon* and its appurtenances.

100.    Defendants knew or should have known that their reckless conduct would result in a foreseeable blowout and release of hydrocarbons, causing personal injuries, deaths, property and/or contamination of the Gulf of Mexico.  Furthermore, it is and was at all material times foreseeable for the blowout and release of hydrocarbons to cause damage to the economic and business interests of Florida given its proximity to the area affected by the Spill.

101.    As a direct and proximate result of Defendants' reckless conduct, Florida has suffered legal injury and damages for which Defendants

are jointly and severally liable, including but not limited to, loss of income, loss of profits, and other economic losses.

## COUNT VI
### (Strict Liability for Abnormally Dangerous Activity Under Florida Law Against All Defendants)

102.   Florida realleges the allegations of paragraphs 1 through 71 of this Complaint and further alleges:

103.   Defendants were engaged in abnormally dangerous and/or ultrahazardous activities.

104.   Defendants' activities resulted in explosions, fires, and release of hydrocarbons from the Macondo Well, which:

a.   Created a high degree of risk of harm to others, and particularly to Florida;

b.   Created a risk involving a likelihood that the harm threatened by Defendants' activities would be great and/or unwarranted;

c.   Were not a matter of common usage;

d.   Were inappropriate to the place that they were being carried on, in that they constituted an unnatural use of the waters of the Gulf of Mexico, which imposed an unusual and extraordinary risk

of harm to Florida, which provides governmental and municipal services to patrons, residents, tourists, and visitors who frequent the Gulf of Mexico and/or its coastline in or around the State of Florida. Additionally, Florida provides many of the resources that contribute to the maintenance of the pristine nature of the Gulf of Mexico and/or its coastline.

105.   As a direct and proximate result of Defendants' conduct in engaging in the abnormally dangerous and/or ultrahazardous activities as alleged herein, substantial quantities of hydrocarbons escaped from the Macondo Well.  This identified and realized harm to Florida is that type of risk that makes Defendants' activities abnormally dangerous and/or ultrahazardous.

106.   Florida is entitled to a judgment finding Defendants strictly liable for the economic damages suffered as a result of Defendants' abnormally dangerous and/or ultrahazardous activities and awarding Florida adequate compensation in an amount to be determined by the trier of fact.

## COUNT VII
## (Trespass Under Florida Law Against All Defendants)

107.   Florida realleges the allegations of paragraphs 1 through 71 of this Complaint and further alleges:

108.   Florida is and was at all material times the owner and/or possessor of real property located along the coastline of the Gulf of Mexico and its adjacent marine and estuarine environments, to wit, numerous public beach access ways connecting improved public rights-of-way with the sandy shore and waters of the Gulf of Mexico.

109.   Defendants' grossly negligent and/or reckless conduct resulted in the deposit of hydrocarbons released from the Macondo Well into or onto the real property owned and/or possessed by Florida located within the jurisdictional reaches of this Court.

110.   Defendants' grossly negligent and/or reckless conduct has directly and proximately resulted in a disturbance in Florida's possession, use, and enjoyment of its ownership interest in or possession of the property, and diminished economic activity.

111.   As a direct and proximate result of Defendants' grossly negligent and/or reckless conduct, Florida has suffered interference with the use and enjoyment of its property, including, but not limited to, loss of tax revenues and other economic damages.

112.   Defendants' grossly negligent and/or reckless conduct entitles Florida to punitive and/or exemplary damages in addition to the actual damages alleged above.

113.   By reason of the foregoing, Florida has incurred economic damages and is entitled to compensatory and punitive damages in an amount to be determined by the trier of fact.

## COUNT VIII
### (Nuisance *Per Se* Under Florida Law Against All Defendants)

114.   Florida realleges the allegations of paragraphs 1 through 71 of this Complaint and further alleges:

115.   Defendants have engaged in conduct that has annoyed, injured and/or endangered the comfort and/or welfare of Florida.

116.   Defendants' conduct has directly and proximately resulted in unreasonable, unwarrantable and/or unlawful interference with or has obstructed and/or rendered insecure Florida's use and enjoyment of its property.

117.   Based on the foregoing, Defendants are jointly and severally liable for the wrong and injury done thereby.

118.   At all material times, Defendants' conduct constituted a nuisance *per se* under Florida law.

119.   As a direct and proximate result of the unreasonable, unwarrantable and/or unlawful conduct of Defendants, Florida has suffered interference with the use and enjoyment of its property, including, but not limited to loss of tax revenues and other economic damages.

120.   Florida is entitled to a judgment against Defendants for the economic damages suffered as a result of Defendants' conduct in an amount to be determined by the trier of fact.

## COUNT IX
## (Punitive Damages Under the General Maritime Law Against BPXP)

121.   Florida realleges the allegations of paragraphs 1 through 71 and 92 through 96 of this Complaint and further alleges:

122.   BPXP owned a leasehold interest in the Macondo Well and oversaw the drilling activities at the site.

123.   BPXP neglected to ensure the safety of its operations by, *inter alia*, failing to properly maintain the BOP stack, failing to monitor the wellhead pressures, and failing to prevent the unabated flow of hydrocarbons into the Gulf of Mexico.

124.   The foregoing allegations demonstrate wanton, reckless, and grossly negligent conduct.

125.   On or about November 16, 2012, BPXP pled guilty to certain criminal charges brought by the United States for actions leading up to, handling of, and arising out of the Spill.

126.   BPXP's guilty plea is *prima facie* evidence of its wanton, reckless, and grossly negligent conduct.

127. BPXP's guilty plea demonstrates its acceptance of the allegations of wrongdoing against it.  The charges that BPXP pled guilty to warrant punitive damages such that future parties are dissuaded from engaging in the same or similar wanton, reckless, and grossly negligent conduct.

128.   Accordingly, under the General Maritime Law (including, but not limited to, by virtue of the Admiralty Extension Act), Florida is entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT X
## (Punitive Damages Under Florida Law Against BPXP)

129.   Florida realleges the allegations of paragraphs 1 through 71 and 98 through 101 of this Complaint and further alleges:

130.   BPXP owned a leasehold interest in the Macondo Well and oversaw the drilling activities at the site.

131.   BPXP neglected to ensure the safety of its operations by, *inter alia*, failing to properly maintain the BOP stack, failing to monitor the wellhead pressures, and failing to prevent the unabated flow of hydrocarbons into the Gulf of Mexico.

132.   The foregoing allegations demonstrate wanton, reckless, and grossly negligent conduct.

133.   On or about November 16, 2012, BPXP pled guilty to certain criminal charges brought by the United States for actions leading up to, handling of, and arising out of the Spill.

134.   BPXP's guilty plea is *prima facie* evidence of its wanton, reckless, and grossly negligent conduct.

135.   BPXP's guilty plea demonstrates its acceptance of the allegations of wrongdoing against it.  The charges that BPXP pled guilty to warrant punitive damages such that future parties are dissuaded from engaging in the same or similar wanton, reckless, and grossly negligent conduct.

136.   Accordingly, under applicable State Law, Florida is entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT XI
## (Punitive Damages Under the General Maritime Law Against All Defendants)

137.   Florida realleges the allegations of paragraphs 1 through 71 and 92 through 96 of this Complaint and further alleges:

138.   BP and Halliburton owned leasehold or other financial interests in the Macondo Well.   BP oversaw and was responsible for the drilling activities at the site.  Halliburton designed the foam slurry that was intended to maintain the wellhead integrity.

139.   BP neglected to ensure the safety of its operations by, *inter alia*, failing to properly maintain the BOP stack, failing to monitor the wellhead pressures, and failing to prevent the unabated flow of hydrocarbons into the Gulf of Mexico.

140.   Halliburton employed a faulty mix design that it knew was inadequate to maintain the integrity of the wellhead.

141.   The foregoing allegations demonstrate wanton, reckless, and grossly negligent conduct under the General Maritime Law.

142.   Due to the wanton, reckless, and grossly negligent conduct of the Defendants, Florida suffered irreparable harm, the extent of which can only be demonstrated through an award of punitive damages.

143.   Accordingly, under the General Maritime Law (including, but not limited to, by virtue of the Admiralty Extension Act), Florida is entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT XII
### (Punitive Damages Under Florida Law Against All Defendants)

144.   Florida realleges the allegations of paragraphs 1 through 71 and 98 through 101 of this Complaint and further alleges:

145.   BP and Halliburton owned leasehold or other financial interests in the Macondo Well.   BP oversaw and was responsible for the drilling activities at the site.   Halliburton designed the foam slurry that was intended to maintain the wellhead integrity.

146.   BP neglected to ensure the safety of its operations by, *inter alia*, failing to properly maintain the BOP stack, failing to monitor the wellhead pressures, and failing to prevent the unabated flow of hydrocarbons into the Gulf of Mexico.

147.   Halliburton employed a faulty mix design that it knew was inadequate to maintain the integrity of the wellhead.

148.   The foregoing allegations demonstrate wanton, reckless, and grossly negligent conduct under Florida law.

149.   Due to the wanton, reckless, and grossly negligent conduct of the Defendants, Florida suffered irreparable harm, the extent of which can only be demonstrated through an award of punitive damages.

150.   Accordingly, under applicable State Law, Florida is entitled to an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the State of Florida demands judgment against Defendants, jointly and severally, as follows:

A.    Economic and compensatory damages in amounts to be determined at trial;

B.    Statutory damages;

C.    Statutory penalties;

D.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

E.    Punitive damages in an amount to be determined at trial;

F.    Attorneys' fees in those claims stated above that provide for such recovery;

G.    Costs; and

H.      Such other and further relief available under all applicable state and federal laws and any relief this honorable Court deems just and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Under Fed. R. Civ. P. 38(b), the Sate of Florida hereby demands trial by jury.

> **PAMELA JO BONDI**
> ATTORNEY GENERAL
> STATE OF FLORIDA
>
>
> BY:  <u>s/ Russell S. Kent</u>
> RUSSELL S. KENT
> Special Counsel for Litigation
> Florida Bar No. 0020257
> E-Mail: russell.kent@myfloridalegal.com
> Office of the Attorney General
> The Capitol, PL-01
> Tallahassee, FL 32399-1050
> Telephone:  (850) 414-3854
>
> PATRICIA A. CONNERS
> Associate Deputy Attorney General
> Florida Bar No. 361275
> Email: Trish.Conners@myfloridalegal.com
> Office of the Attorney General
> The Capitol, PL-01
> Tallahassee, FL 32399-1050
> Telephone:  (850) 245-0140
>
> -and-

CARL R. NELSON
Florida Bar No: 0280186
Email: cnelson@fowlerwhite.com
FOWLER WHITE BOGGS P.A.
P.O. Box 1438
Tampa, FL  33601-1438
Telephone: (813) 228-7411

S. DRAKE MARTIN
Florida Bar No:  0090479
Email: drakemartin@nixlawfirm.com
Nix Patterson & Roach, LLP
1701 E. County Hwy 30-A, Suite 201-B
Santa Rosa Beach, FL 32459
Telephone:  (850) 231-4028

LOUIS B. ("BRADY") PADDOCK
Texas Bar No: 00791394
Arkansas Bar No: 93135
Louisiana Bar No. 28711
Email:  bpaddock@nixlawfirm.com
Nix, Patterson & Roach, LLP
2900 St. Michael Drive, Suite 500
Texarkana, TX  75503-5211
Telephone: (903) 223-3999
Fax No:  (903) 223-8520

FRANKLIN R. HARRISON
Florida Bar No: 0142350
Email:fharrison@harrisonsale.com
Harrison, Sale, McCloy, Chartered
304 Magnolia Avenue
Panama City, Florida 32401-3125
Telephone: (850) 769-3434

ADRIEN A. ("BO") RIVARD, III
Florida Bar No: 0105211
Email: brivard@harrisonrivard.com

Harrison Rivard Duncan & Buzzett, Chtd.
101 Harrison Avenue
Panama City, Florida 32401
Telephone: (850) 769-7714

*Counsel for Plaintiff, State of Florida*